LYONS, JUDGE:
This claim arises out of contracts for the construction of a multipurpose physical education facility at Marshall University, Huntington, West Virginia.
By agreement dated the 26th day of September, 1977, the West Virginia Board of Regents entered into an architectural agreement with Robert J. Bennett, A.I.A. and Associates and the Eggers Group, which formed Bennett/Eggers Architects, a joint venture to provide professional architectural service essential to the design and construction.
Article 15 of the Agreement provided a fixed limit construction cost of Sixteen Million Five Hundred Ninety Thousand Dollars.
The joint venture group designed substantially the multipurpose building as it exists today. The first bid proposals were in the range of Twenty Million Dollars, a considerable amount above the fixed limit of construction as referenced in Article 15. The Architects, after preparing an addendum to the specification which is described Addendum Bulletin Number 1, invited bids for five prime contracts. They were of the opinion that this would bring about the lowest bid possible; however, the evidence shows that this bidding would increase the construction period, administrative and cost. Prior to receiving the bids, the architects furnished to the Board of Regents a project time schedule dated November 30, 1978 in the form of a Bar Chart.
*60 On March 1, 1979, the bid tabulations were made. The bleacher and seating work contract was awarded to American Desk Manufacturing Company. The swimming pool contract was awarded to Whitten Corporation. The electrical work was awarded to Kirby Electric Service, Inc. The mechanical work was awarded to Hughes-Bechtol, Inc., and the general construction work was awarded to Mellon-Stuart Company.
In August 1977, the Board of Regents had authorized the architects to obtain sub-surface data, both boring and laboratory testing service pertinent to the foundation design for the facility. In the same month, Mr. Robert J. Bennett, one of the architects, requested a complete survey of the project area from Lambert and Company of Huntington, West Virginia. Lambert and Company furnished to Mr. Bennett all the information requested by him and prepared the site plan, which is designated SU-1.
On December 20, 1977, Syska and Hennessy, Inc., Engineers, informed the Eggers Group, the architects, of their recommendations concerning the sanitary and storm sewers in the construction area and made a number of recommendations prior to the start of construction. In his letter of December 20, 1977, Kenneth E. Cline, P. E. was of the opinion that the estimated sewer relocation time would be approximately six months and needed a solution to the matter as the same may interfere with the scheduling of new construction.
A Notice to proceed was issued effective as of May 9, 1979. The contract required that the base contract was to be completed within 700 consecutive calendar days from the date of the notice to proceed, and the alternates to the Gullickson Hall were to be completed within 150 calendar days after the completion of the base contract, thus making the completion date for the base contract work April 6, 1981 and the completion date for the Gullickson Hall alterations September 3, 1981.
Mellon-Stuart Company, by separate contract, was to coordinate construction by conducting progress and safety meetings by updating job progress schedules and by expediting shop drawings and correspondence.
The initial work on the project was the mass excavation and foundation work to be performed by Mellon-Stuart Company. The site plan identified certain utility lines throughout the project area. The plans specified no particular time for the relocation of the utility lines. The removal of the utilities and the relocation of the utilities and the street abandonment were obviously the first work to be performed. The party responsible for the relocation and/or removal of the 36-inch storm sewer and the 12-inch sanitary sewer was Hughes-Bechtol Company. The electric lines were the responsibility of Kirby Electric. The telephone lines were the responsibility of the telephone company. The main and service gas lines were the responsibility of the gas company.
The design provided that the excavation go to a certain grade which the architects determined would be sufficiently compact to support a concrete slab. Additional foundation work was the underpinning of Gullickson Hall and the foundation concrete work consisting of piles, pile caps, and tie beams and foundation walls.
*61 Mellon-Stuart filed with the architect a preliminary time schedule designated on a Bar Chart. This chart designates each sequence of work and the time allocated for the work to be performed. The schedule allowed one month from the date of the notice to proceed to complete the relocation of known utilities and the abandonment of the streets. Based upon the notice to proceed of May 9, 1979, the schedule was to start relocation of the utilities on May 9, 1979 and to be completed on June 6, 1979. The mass excavation was to begin on May 22, 1979 and to be completed by September 22, 1979. The underpinning of the Gullickson Hall was to begin on June 13, 1979 and be completed by July 3, 1979. Pile Foundation work was to begin in June 1979 and be completed in October 1979. Foundation walls were to be started in August 1979 and be completed by October 24, 1979. Structural steel work was to start on October 25, 1979 and to be completed in April of 1980. The original plan was to complete the mass excavation, pile driving and contract work in summer and fall of 1979. The structural steel work was to proceed through the winter for the completion of that work in April 1980. The work did not proceed as planned. Mellon-Stuart contends there were errors and omissions in the site plan. It was discovered that a gas service line at Gullickson Hall was located approximately 35 feet from Gullickson Hall rather than immediately adjacent to the building. There was a six-inch high pressure gas line known as the Devon Gas line running along the entire length of the easterly side of the excavation, which line was not shown in the contract documents or the site plan. There were also gas lines extending from Third Avenue into the project site that were not shown on the plans. There were other lines extending into the areas of the mass excavation. Mellon-Stuart contends that the State failed to relocate these utilities in a timely manner.
The evidence indicates that contrary to the schedule, Virginia Avenue was not abandoned until September 24, 1979. The 36-inch sewer line was not relocated until October of 1979. The 12-inch sewer line, running the length of the project along Virginia Avenue, was not relocated until July 20, 1979. The electric lines running the entire length of the project were not relocated until August of 1979. The telephone line running the entire length of the project was not relocated until August of 1979. Utility poles found along the entire length of Virginia Avenue and the project were not removed until about August of 1979. The water line, running the length of the project along Virginia Avenue, was not relocated until August of 1979. The Columbia Gas line running the length of the project was not relocated until September of 1979. The Devon Gas Line was not relocated until August of 1979. The Gullickson Hall gas line was not relocated until September of 1979. The undisclosed water line south of Gullickson Hall was not relocated until September of 1979.
Mellon-Stuart contends there was improper sub-grade design as there was not an accurate specification given on the soil conditions. The specifications called for excavation to grade and pouring of a concrete slab on grade. This was not possible as the subsoil was very wet and jellylike. Mellon-Stuart contends that an engineered sub-grade should have been specified;, that prolonged maintenance of the excavation was required by the delays in relocation and removal of the site utilities; that the entire project was thus delayed; that the plans and *62 specifications contained numerous errors and omissions in addition to those directly affecting site access and that change orders were delayed and had a direct impact on the project schedule.
Errors and modifications affecting the schedule included the Kalwall installation, doors and windows, concession areas, ceilings and pool area. All of these, the claimant contends, had an appreciable time impact. Mellon-Stuart contends that the respondent failed to manage the project by its failure to maintain on-site personnel authorized to act for the respondent; by its failure to adopt and adhere to or require adherence by other contractors of any project schedule; by its failure to issue change orders extending the project time as required by contract; by its failure to issue change orders in a timely manner, extending the project time as to some, but not all, prime contractors; by its failure to manage the contract of Hughes-Bechtol; that Hughes-Bechtol quit the project for a month and refused to follow any reasonable project schedules or directives.
The Court is of opinion that Mellon-Stuart and Kirby fulfilled their obligations with respect to delays; that the respondent failed to fulfill its obligation to coordinate the work of the multiple prime contractors and to provide timely and reasonable site access to the claimants; that the respondent breached its obligation to fully and properly disclose site drainage conditions; that the contractor, Mellon-Stuart and Kirby, owed a duty to mitigate their damages. When Mellon-Stuart was given notice to proceed and went upon the site, it was evident that the utility lines had not been removed and should have revised its schedule to take into consideration delays to result from winter working conditions.
The Court is of the opinion that the respondent is responsible for any negligent acts and omissions of its architect, agents and representatives in connection with this project.
The Court is further of the opinion that the claimants are entitled to recover costs attributable to extra work caused by concealed conditions and design defects but not for the total amounts claimed.
Mellon-Stuart, in its presentation of its claim, seeks a recovery of $1,928,099.85 including a retention of $37,500.00 by the respondent. Kirby, in its presentation, seeks to recover $504,936.46.
On January 25, 1984, Mellon-Stuart filed with the Court a Pre-Hearing Statement which included an explanation of damages being claimed, including damages for each of several of its subcontractors. Damages claimed for subcontractors had not been mentioned, as such, in its Notice of Claim. On March 26, 1984, the opening day of hearing, the respondent filed a written Motion for Partial Summary Judgement with reference to the subcontractors' claims, and a written memorandum in support of same. The Court deferred ruling on the motion at that time. Subsequently, the construction contracts between Mellon-Stuart and certain subcontractors were admitted into evidence, as were post-construction agreements between them with reference to damage claims. Evidence was received on additional costs the subcontractors *63 incurred and the reasons therefore. On October 23, 1984, claimant filed its brief in opposition to the motion. The Court now overrules the said motion. However, this Court has no obligation or authority to determine the rights and obligations as between Mellon-Stuart and its subcontractors.
After consideration of the record, the Court finds that Mellon-Stuart is entitled to an equitable award of $660,434.33 and the restoration of the retention held by the respondent in the amount of $37,500.00 for a total award of $697,934.33. The Court further finds that Kirby is entitled to an award of $107,835.04.
Award of $697,934.33 to Mellon-Stuart Company.
Award of $107,835.04 to Kirby Electric Company.